UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF ARKANSAS
JONESBORO DIVISION

LINDA BRYANT                                                                                          PLAINTIFF


v.                                        CASE NO. 3:02-CV-0280 GTE


HARTFORD LIFE AND
ACCIDENT INSURANCE COMPANY                                                         DEFENDANT


ORDER ON MOTIONS FOR JUDGMENT

Presently before the Court are the parties Motions for Judgment on the Record.

**I.      Background**

Plaintiff Linda Bryant was employed as a cashier at Wal-Mart Stores, Inc. Because of her employment, Bryant was eligible for coverage under long-term disability (LTD) policy no. GLT205215 (the "Policy"), which was issued to Wal-Mart by Defendant Hartford Life and Accident Insurance Company. The Policy provides, in pertinent part:

> "Total Disability or Totally Disabled means that:
>     (1)  during the Elimination Period; and
>     (2)  for the next 12 months, you are prevented by:
>             (a) accidental bodily injury;
>             (b) sickness;
>             (c) Mental Illness;
>             (d) substance abuse;
>             (e) pregnancy,
>
> from performing the essential duties of your occupation, and are under the continuous care of a Physician and as a result you are earning less than 20% of your Pre-disability Earnings, unless engaged ina program of Rehabilitation Employment approved by us.

1

> After that, you must be so prevented from performing the essential duties of any occupation for which you are qualified by education, training or experience.
>
> "Your occupation" includes similar job positions with the Employer which may be offered to you, with a rate of pay 60% or greater of your indexed Pre-disability Earnings.

> Partially Disabled means that you are prevented by Disability from doing all the material and substantial duties of your own or any occupation on a full-time basis, except that:
> (1) you are performing at least one of the material duties of your own occupation on either a full-time or part-time basis;
> (2) you are under the continuous care of a Physician; and
> (3) you are currently earning 20% to 80% less per month than your Indexed Pre-disability Earnings due to the same injury or sickness that caused the disability.

[Tr. 785, 898]. "'Disabled' means either Totally or Partially Disabled." [Tr. 790]. The Policy further provides:

> You will be paid benefits if, while insured under the group policy, you:
> (1) become Totally Disabled;
> (2) remain Totally Disabled throughout the Elimination Period;
> (3) remain Disabled beyond the Elimination Period; and
> (4) submit proof of loss satisfactory to The Hartford.
>
> Benefits accrue as of the first day after the Elimination Period and are paid monthly. No benefit will be paid for any day on which you are not under the care of a legally qualified Physician.
>
> The Hartford will pay benefits until the first to occur of:
> (1) the date you are no longer Disabled;
> (2) the date you fail to furnish proof that you are continuously Disabled;
> . . .

[Tr. 794].

Plaintiff's last day of work was May 29, 1997. [R. 881]. Plaintiff states that she became disabled on July 14, 1997, applied for disability, and was denied. [R. 747]. Plaintiff states that

short-term disability benefits were eventually paid to the maximum of the short-term policy. On August 21, 1997, Plaintiff was admitted to the emergency room due to a swollen right leg three weeks postpartum and underwent an emergency faciotomy. [Tr. 1292]. Five days later, she underwent a graphing of the wound. [Tr. 1294]. She was readmitted for regrafting due to failure of the first graft, and was discharged on October 18, 1997, with a prescription for a dynamic splint because of significant foot drop and for Coumadin. [Tr. 1246-67]. She was readmitted on December 11, 1997, due to a painful right leg. [Tr. 1307]. She developed a deep vein thrombosis with vascular compromise and had to undergo faciotomy and grafting and closure. She then developed an infection and had to undergo debridement of some nonviable tissue. [Tr.. 1227, 1281-85]. Wound culture yielded results of methicillin-resistant staphylococcus arreus (MRSA), vancomycin resistant enterococuss (VRE), and proteus and resistant pseudomonas, and she was placed in isolation. [Tr. 1232, 1265]. Plaintiff was refused admission to rehabilitation due to the VRE. [Tr. 1228]. She was later discharged to her home with home health and outpatient rehabilitation. Plaintiff's deep vein thrombosis and subsequent complications ultimately led to Bryant suffering from bilateral foot drop and being required to wear leg braces to assist in walking. [R. 1163].

On January 13, 1998, Plaintiff applied for long-term disability benefits. [R. 698]. Plaintiff states that she was prescribed Prozac for depression, Levothyroid for hypterthyroidism and Coumadin at discharge on January 25, 1998. On February 16, 1998, she was diagnosed with hereditary coagulopathy, and due to pregnancy was switched from Coumadin to Heparin. [Tr. 199, 1301]. On May 5, 1998, Plaintiff's application for LTD benefits was approved. [R. 638]. By letter dated December 9, 1998, the Defendant terminated benefit payments as of August 31,

1998. The Defendant stated that according to the policy language, she must be under the continuous care of a Physician for her disabling condition, but that Plaintiff indicated in an October 18, 1998, telephone conversation that she had not seen her attending physician for her disabling condition since approximately May 1998. [R. 634]. Plaintiff was again hospitalized on January 12, 1999, when her left arm became infected from a heparin shot. [Tr. 1126].

The Plaintiff appealed the decision denying her benefits beyond August 31, 1998, and on January 21, 1999, the Defendant advised that Plaintiff's benefits were reinstated through February 3, 1999. However, Defendant stated that "no disability benefits are payable to Ms. Bryant beyond February 3, 1999." Defendant states that Ms. Bryant had received LTD benefits from February 4, 1998, through February 2, 1999 based on her inability to perform the essential duties of her own occupation as a standing cashier. They further stated that while Dr. Day's report dated March 31, 1998, indicated that Ms. Bryant's loss of function of her peroneal nerves would significantly affect her ability to perform her occupation as a standing cashier, it appears that Ms. Brant would be able to perform a sedentary occupation, as there are no restrictions noted that limit her from sitting. [R. 625].

On March 16, 1999, Plaintiff appealed the decision denying further LTD benefits stating that she is additionally affected with hypothyroidism, depression, vacomycin-resistant enterococcus, methicillin-resistant staphlococcis aureus, pseudomona and proteus. [R. 1900-1901]. Defendant denied Plaintiff's appeal on September 28, 1999. [R.1889-90]. On October 25, 1999, Plaintiff was awarded Social Security Disability ("SSDI") benefits. [R. 1862-65]. On January 9, 2000, Defendant informed Plaintiff that it had received information regarding her award for SSDI benefits, which indicated that Plaintiff's SSDI benefits commenced effective

February 1998 at a monthly rate of $569.00.  Defendant stated that because it was not previously offsetting the SSDI benefits, it overpaid the Plaintiff for the period February 1998 through December 1999.  Defendant further informed Plaintiff that in the event she remained Totally Disabled, her total monthly disability benefit would be $50, once her overpayment was recovered.[1]  [R.1814-16].  On January 29, 2000, Hartford requested reimbursement in the amount of $2,901.08, which reflects an application of benefits for the period of February 4, 1999, through January 31, 2000 against the overpayment in accordance with the January 4, 1997, authorization. [R. 1819, 1821-23].

On August 5, 2000, Defendant terminated Bryant's monthly benefits under the Policy due to her failure to provide continuing proof that she was "totally disabled" as required under the terms of the Policy, referencing the unfulfilled March and June 2000 requests for information. [R. 1800-02, 1818-19].  The letter also stated that the current overpayment balance of $2,651.08 would be sent to Defendant's Collection Agency. [R. 1801].  Plaintiff's attorney appealed the decision and submitted an affidavit stating that the requests for information were not received dated February 12, 2001. [R.1797].  Hartford sent another set of forms for completion on February 7, 2001, but did not reverse its decision. [R. 22].

On July 30, 2001, Plaintiff was admitted to St. Bernard's Hospital complaining of left leg pain, and was given a diagnosis of DVT (deep vein thrombosis) and recurrent systemic embolism and placed on Coumadin and Heparin. [Tr. 1082, 1096, 1099].  On August 28, 2001, Plaintiff was admitted to St. Bernard's Hospital with left ankle contractures. [Tr. 1070].  Dr. Jameson of

---

[1] Plaintiff's Gross Monthly LTD Benefit under the Policy was listed as $595.14. Defendant offset Plaintiff's monthly SSDI award of $569.00, resulting in $50 in Monthly LTD Benefits Payable under the Policy.

the Orthopedic Clinic in Memphis, Tennessee, performed surgery lengthening the Achilles tendon. [Tr. 1059]. She was referred to St. Bernard's Rehabilitation Services for therapy, where it was noted that Plaintiff had bilateral foot drop and has been in "AFO's since then." [Tr. 1052]. On July 3, 2002, Plaintiff was again admitted to St. Bernard's Hospital with complaints of left leg pain with possible DVT, but the report concluded that "[n]o DVT above the left knee" was found. [Tr. 1033].

On July 10, 2002, Ms. Bryant filed her Complaint in the Circuit Court of Craighead County alleging various state law causes of action. Defendant removed the case to this Court on August 9, 2002, on the basis that Plaintiff's claims were preempted by ERISA. On January 9, 2003, the parties filed a Joint Motion to Stay for the purpose of reopening the administrative review process, which was granted. Defendants state that Plaintiff was ultimately awarded and received benefits under the Policy through May 31, 2003, and therefore, only the review process after the Administrative Record was reopened is relevant to the issues in the present case.

On August 15, 2003, Defendant Hartford requested a claimant questionnaire/other income questionnaire, authorization form, and attending physician statement. [Tr. 1165]. Plaintiff submitted an updated claimant questionnaire and attending physician statement of continuous disability to Hartford by letter dated October 17, 2003. [Tr. 1157]. In February 2004, Plaintiff was in a motor vehicle accident and received x-rays of her spine and hip. [Tr. 1046-48]. On February 17, 2004, Hartford informed Plaintiff that they were requesting additional medical records from Dr. McGrath, and sent Dr. McGrath a letter that day. [Tr. 1152, 1154]. Defendant also requested a work and educational history from Plaintiff, which Plaintiff submitted on March 1, 2004. [Tr. 1148, 1152]. On April 15, 2004, Defendant requested additional information

regarding Dr. Bradley and Plaintiff's class load and work study position at Arkansas State University ("ASU"), which Plaintiff provided on April 27, 2004. [Tr. 986, 978-79]. Plaintiff stated that she worked five days a week at a work-study job, which had been changed to part-time, and attended classes full-time (from 12-18 hours per semester) at ASU, where she was a sophomore. [Tr. 980].

Defendant states that it referred Plaintiff's file to a nurse case manager on May 26, 2004. [Tr. 842]. Defendant's Summary Detail Report indicates that the nurse case manager reviewed the records from 1999 going forward, and that she found "claimant had functionality" as of May 2003. [Tr. 842-45]. On July 28, 2004, Defendant Hartford issued a letter to Plaintiff stating that after review of the Attending Physician's statement of Continued Disability ("APS"), medical records from Dr. McGrath, and medical records from St. Bernard's Medical Center and Dr. Bradley, her benefits were being reinstated through May 31, 2003. [Tr. 900]. However, Defendant stated that she was not eligible for LTD benefits beyond May 31, 2003. [Tr. 901]. Defendant then applied the $1,700 ($50 X 34 months) to the "overpayment balance of $2,601.08, leaving an "outstanding balance of $901.08." [Tr. 901].

Plaintiff appealed this decision, requesting a copy of the claim file. Defendant Hartford set a deadline of February 15, 2005, for submission of additional information. [Tr. 928]. On February 14, 2005, Plaintiff objected to the deadline because Defendant had not provided Plaintiff with the requested information. [Tr. 914]. On March 3, 2005, Defendant responded that they were enclosing all "relevant information" with the letter. [Tr. 913]. On March 14, 2005, Plaintiff informed Defendant Hartford that no further information would be submitted and review should proceed. [Tr. 908]. On April 29, 2005, Hartford issued its final denial of Plaintiff's claim

for benefits. [Tr. 896-97]. On October 21, 2005, Plaintiff moved to reinstate her complaint. The Court granted this request on October 31, 2005.

**II.     Standard**

An administrator's decision to deny benefits under an employee welfare plan is reviewed *de novo*, unless the benefit plan gives the "administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Brunch*, 489 U.S. 101, 115, 109 S. Ct. 948, 103 L. Ed. 2d 80 (1989). When the benefit plan gives the "administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan," the district court's review is for an abuse of discretion. *Id.*; *Clapp v. Citibank, N.A. Disability Plan*, 262 F.3d 820 (8th Cir. 2001).

Plaintiff argues that a de novo standard of review should apply because the statement "Hartford reserves the right to determine if your proof of loss is satisfactory" is not sufficient to give rise to the abuse of discretion standard. [Tr. 827]. However, as Defendant notes, the Policy clearly states, "Hartford has full discretion and authority to determine eligibility for benefits and to construe and interpret all terms of the Group Insurance Policy." [Tr. 785]. Therefore, it is clear that an abuse of discretion standard applies.

However, the Eighth Circuit has held that "some less deferential standard of review is triggered where the claimant presents "material, probative evidence demonstrating that (1) a palpable conflict of interest . . . existed, which (2) caused a serious breach of the plan administrator's fiduciary duty to her." *Schatz v. Mutual of Omaha Ins. Co.*, 220 F.3d 944, 947 (8th Cir. 2000) (citing *Woo v. Deluxe Corp*, 144 F.3d 1157, 1160 (8th Cir. 1998)). "It is only after a claimant clears this initial 'two-part gateway requirement,' that we apply the 'sliding scale'

approach of determining just how much less deferential the nature of the plan administrator's conflict warrants our being to the plan administrator's decision to deny benefits." *Id*. (citing *Woo*, 144 F.3d at 1161).

"As a general matter, when the insurer is also the plan administrator, we have recognized something akin to a rebuttable presumption of a palpable conflict of interest." *Id*. at 947-48 (citing *Barnhart v. UNUM Life Ins. Co.,* 179 F.3d 583, 587-88 (8th Cir. 1999)). "Indicia of bias can be negated by 'ameliorating circumstances,' such as 'equally compelling long-term business concerns' that militate against improperly denying benefits despite the dual role." *Id.* at 948 (citing *UNUM Life*, 179 F.3d at 588; *Farley v. Arkansas Blue Cross & Blue Shield,* 147 F.3d 774, 777 (8th Cir.1998)). However, as discussed in *Payzant v. UNUM Life Ins. Co*, 402 F. Supp. 2d 1053, 1061 (D. Minn. 2005), "the Eighth Circuit has also stated that 'not every funding conflict of interest . . . warrants heightened review because ERISA itself contemplates the use of fiduciaries who might not be entirely neutral,' *Tillery v. Hoffman Enclosures, Inc.,* 280 F.3d 1192, 1197 (8th Cir. 2002), and 'it is wrong to assume a financial conflict of interest from the fact that a plan administrator is also the insurer.' *McGarrah v. Hartford Life Ins. Co.,* 234 F.3d 1026, 1030 (8th Cir. 2000)."

"The Eighth Circuit has not definitively determined whether the plaintiff has the burden of producing actual evidence of a financial conflict, or whether the defendant, after the plaintiff has alleged that the defendant is both the insurer and the administrator, has the burden of producing evidence to rebut the presumption of conflict of interest." *Id*. (comparing *McGarrah,* 234 F.3d at 1030, *with Schatz,* 220 F.3d at 947-48, *and Phillips-Foster v. UNUM Life Ins. Co. of*

*America,* 302 F.3d 785, 795 (8th Cir. 2002), *and Torres v. UNUM Life Ins. Co. of America,* 405 F.3d 670, 678 (8th Cir. 2005)).

Here, Plaintiff argues that Defendant is both the insurer and the plan administrator. In its Response, Defendant does not expressly deny this allegation. Plaintiff alleges that Defendant's direct financial benefit in denying a claim is "dramatically demonstrated" by a letter from Defendant Hartford requesting that Plaintiff make her reimbursement check payable to "The Hartford Life Insurance Company." [Tr. 44]. Plaintiff also relies on a letter from Dun & Bradstreet to Hartford Life dated October 26, 2000, addressing Hartford's attempts to recover its overpayment of benefits to the Plaintiff. [Tr. 1809].

Defendant argues that the Administrative Record is silent as to any further active pursuit of this overpayment, and that the letter indicates that active collection efforts were not pursued after October 26, 2000. Defendant states that the only other mention of any attempt to collect overpayment is Hartford's letter of July 28, 2004, which approved benefits to Bryant through May 31, 2003, and requested payment of the outstanding balance of the overpayment. Defendant states there is no evidence that Hartford took affirmative steps to collect this overpayment from Bryant, and Defendant's final denial letter did not even mention the overpayment. [Tr. 896-97].

The Court need not decide whether a palpable conflict of interest existed, however, because even assuming that such a conflict of interest exists, the Court finds that such conflict did not cause a serious breach of the plan administrator's fiduciary duty to the Plaintiff. "The mere fact of an 'unameliorated' structural conflict of interest does not necessarily warrant a less deferential standard of review." *Id.* Therefore, the Court must determine whether Plaintiff has

satisfied the second part of the gateway test "by presenting material, probative evidence that this palpable conflict of interest actually caused a serious breach of the plan administrator's fiduciary duty to her." *Id*. The Eighth Circuit has noted that the second the second part of the gateway test "presents a considerable hurdle for plaintiffs." *Id.* (citing *UNUM Life*, 179 F.3d at 588 n.9). "The evidence offered by the claimant must give rise to 'serious doubts as to whether the result reached was the product of an arbitrary decision or the plan administrator's whim.'" *Id.* (citing at *UNUM Life*, 179 F.3d at 589; *Layes v. Mead Corp.,* 132 F.3d 1246, 1250 (8th Cir.1998)).

Plaintiff argues that the second requirement is met in this case because "when [the Defendant], as plan administrator denies benefits, it will receive a direct financial benefit as plan insurer," and the Defendant denied the Plaintiff's claim without seeking any medical review, as in *Woo*. 144 F.3d at 1161. In *Woo*, the defendant "was confronted with medical evidence of an uncommon disease and the opinions of two treating physicians stating that, in retrospect, [the plaintiff] had been disabled from her job before she resigned," and therefore "failed to use proper judgment by not having a scleroderma expert review her claim." *Id*. The Eighth Circuit found that "[t]his serious procedural irregularity also had a sufficient connection to the decision reached to trigger a less deferential review because Hartford's 'actual decision was reached without reflection and judgment,'" despite the defendant's reliance upon an in-house consultant's review of the plaintiff's claim. *Id*.

However, in *Heaser v. The Toro Co.*, 247 F.3d 826, 833-34 (8th Cir. 2001), the defendant did not commit a procedural irregularity by failing to send a fibromyalgia claimant to a specialist because the defendant had the claimant's medical records, directly contacted the one of the claimant's treating physicians, who was a rehabilitation specialist that informed the defendant

11

that he no longer considered the plaintiff disabled, and an in-house consultant specializing in pulmonary medicine reviewed the plaintiff's records.  The court distinguished *Woo* by noting that in *Woo* the decision "to use a less deferential standard rested first on a demonstrated financial conflict of interest," and the court "determined that a plan administrator's failure to obtain the opinion of a specialist constituted a procedural irregularity connected to the decision because only the opinion of an in-house medical consultant contradicted the remainder of the record before the administrator, which contained two opinions from treating physicians supporting disability based on an uncommon disease." *Id*. at 833-34.

Plaintiff claims that in this case, Hartford committed a serious procedural irregularity when Plaintiff produced medical evidence of uncommon diseases - hereditary coagulopathy, VRE (vancomycin-resistant enterococci), MRSA (methicilin-resistant staphylococcus aureus), proteus and pseudomonas and Hartford failed to have her examined by a specialist.  Plaintiff argues that these bacterial conditions are uncommon and pose an "insurmountable barrier" to her employment, and relies upon a "Mental Status and Evaluation of Adaptive Functioning" report issued by Dr. Philip Hestand. [Tr. 121-26].

In response to this argument, Defendant states that Plaintiff has cited no Department of Labor regulations related to claims procedures, or any other mandatory procedures under ERISA, that would require employing a specialist under the circumstances presented in this case. Defendant further argues that Plaintiff did not rely upon or identify these conditions as bases for her disability claim on her initial application dated January 10, 1997, or the claimant questionnaire submitted on October 17, 2003. [Tr. 700-01, 1158-61].

Defendant argues that Dr. Hestand's report was issued on May 11, 1999, and as Plaintiff was paid benefits through May 31, 2003, the only benefits currently at issue are those that would be due and owing beyond that date. Defendant states that Dr. Hestand's report only states that Bryant's bacterial conditions pose a barrier to Plaintiff's employment as a cashier, and offers no opinion on whether these conditions would prevent the Plaintiff from performing other occupations. Defendant notes that the weight of the evidence that exists in the Administrative record regarding Bryant's functionality as of May 31, 2003, demonstrates that Bryant attends college classes and works in a work-study position. Therefore, Plaintiff's bacterial conditions were not hindering her functional capacity or her interpersonal relationships.

Defendant also argues that there is no indication that Dr. Hestand is a specialist in the area of bacterial conditions, as the majority of his report references a publication on the subject by North Carolina healthcare professionals. [Tr. 122]. The Court notes that Dr. Hestand's signature page indicates that he is a Ph.D. and Licensed Psychologist. [Tr. 126]. Defendant states that if the Plaintiff did not see a specialist to evaluate her bacterial conditions, she cannot legitimately argue that Hartford was required to hire and have her examined by a specialist. Finally, Defendant argues that the Administrative Record establishes that Defendant's decision not to engage a medical specialist with bacterial condition expertise to examine the Plaintiff was reasonable and was not a "serious procedural irregularity" that warrants application of a less deferential standard of review.

The Court notes that although the cover letter transmitting Dr. Hestand's report is dated August 4, 1999, Dr. Hestand records the date of exam as May 11, 1996, and that when asked whether the claimant's prognosis is expected to improve significantly, Dr. Hestand responds,

13

"The patient's prognosis is best determined by a physician. Review of physician's notes and records seem to indicate little chance of further improvement." [Tr.124-25].

The Court finds that the facts in this case are more analogous to those in *Heaser*, than in *Woo*. Here, in its denial, Hartford acknowledged that Dr. McGrath, Plaintiff's treating physician, completed a form dated October 15, 2003, in which he indicated that the Plaintiff was unable to stand or walk for long periods of time, and unable to perform lifting, carrying, pushing, and pulling. [Tr. 1164]. He also noted that Plaintiff may not be able to drive. However, Dr. McGrath noted no restrictions in the areas of sitting, reaching and working overhead, keyboard use/repetitive hand motion and vision. [Tr. 1164]. He further reported that Plaintiff had "*slight* difficulty in occupational functioning, but generally functioning well. Has some meaningful interpersonal relationships." [Tr. 1164] (emphasis added). Furthermore, on a report dated May 5, 2003, Dr. Bradley, a doctor that examined the Plaintiff on April 28, 2003 stated that Plaintiff "is *mildly* limited in her ability to walk or stand." [Tr. 971] (emphasis added). Defendant also acknowledged that Plaintiff was attending classes on a full-time basis, in addition to performing the duties of answering the telephone, data entry, and filing in Plaintiff's part-time job. [Tr. 901]. Having reviewed the record carefully, the Court is satisfied that Defendant Hartford exercised proper judgment in determining that Plaintiff was not disabled under the terms of the Plan and that, in the circumstances of this case, Defendant did not commit a serious breach of fiduciary duty caused by any structural bias it may have had. Therefore, the abuse of discretion standard applies.[2]

---

[2]The Court notes that even if it had applied a less deferential standard of review, the Court would still find that Defendant Hartford met its burden in this case.

**III.    Discussion**

"Review of an administrator's decision under an abuse of discretion standard, though deferential, is not tantamount to rubber-stamping the result." *Torres v. UNUM Life Ins. Co. of America*, 405 F.3d 670, 680 (8th Cir. 2005). "On the contrary, [the Court] review[s] the decision for reasonableness, which requires that it be supported by substantial evidence that is assessed by its quantity and quality." *Id*. This review employs five factors:

> (1) whether the administrator's interpretation is consistent with the goals of the Plan; (2) whether the interpretation renders any language in the Plan meaningless or internally inconsistent; (3) whether the administrator's interpretation conflicts with the substantive or procedural requirements of the ERISA statute; (4) whether the administrator has interpreted the relevant terms consistently; and (5) whether the interpretation is contrary to the clear language of the Plan.

*Id*.

On July 28, 2004, Defendant Hartford issued a letter to Plaintiff stating that after review of the Attending Physician's Statement of Continued Disability ("APS"), medical records from Dr. McGrath, and medical records from St. Bernard's Medical Center and Dr. Bradley, her benefits were being reinstated through May 31, 2003. [Tr. 900]. However, Defendant stated that she was not eligible for LTD benefits beyond May 31, 2003. [Tr. 901].

In explaining the denial of claims beyond May 31, 2003, Hartford points to Dr. McGrath's office note dated May 27, 2003, in which he stated that he believed Dr. Bradley, whom Dr. McGrath identified as the physician evaluating Bryant's alleged disability, had given Bryant permission to return to work as a cashier. [Tr.997]. After an exam on April 28, 2003, Dr. Bradley issued a report dated May 5, 2003, in which he was asked, "Based on your evaluation, are there any limitations in this claimant's ability to walk, stand, sit, lift, carry, handle, finger,

see, hear or speak, etc. Please assess the severity of limitations (mild, moderate, severe)." [Tr. 971]. Dr. Bradley responded, Plaintiff "is mildly limited in her ability to walk or stand." [Tr. 971].

Plaintiff notes, however, that Dr. Bradley only saw the Plaintiff one time and only for a Social Security consult. Plaintiff further states that Dr. Bradley noted that the Plaintiff limped and wore a brace, even though he later stated she could walk and stand without assistive devices, and could not walk on heel and toes. [Tr. 969]. Plaintiff argues that Dr. Bradley did not consider the bilateral DVT's and lengthening of a tendon or the VRE (vancomycin-resistant enterococci), MRS (methicilin-resistant staphylococcus aureus), and proteus and resistant pseudomonas. [Tr. 971, 1232].

Hartford also stated in its denial that Dr. McGrath completed an APS dated October 15, 2003, in which he indicated that the Plaintiff was unable to stand or walk for long periods of time, and unable to perform lifting, carrying, pushing, and pulling. [Tr. 1164]. He also noted that Plaintiff may not be able to drive. However, Dr. McGrath noted no restrictions in the areas of sitting, reaching and working overhead, keyboard use/repetitive hand motion and vision. [Tr. 1164]. He further reported that Plaintiff had "slight difficulty in occupational functioning, but generally functioning well. Has some meaningful interpersonal relationships." [Tr. 1164]. However, Plaintiff notes that Dr. McGrath also found that Plaintiff has a history of deep vein thrombosis, secondary diagnosis of bilateral foot drop, and that as a consequence, Plaintiff wears braces and has circulation problems. [Tr. 1163]. Plaintiff also states that on August 7, 2000, Dr. McGrath stated that the Plaintiff was disabled from clotting in her legs and extensive surgery to them, and that there is nothing in the record that this condition has improved. [Tr. 1007].

However, the Court gives more credence to Dr. McGrath's more recent assessment of the Plaintiff.

Plaintiff further argues that because of the damages to her legs, she can only walk a short distance (about 25 feet) and only with the assistance of braces. [Tr. 121]. Plaintiff states that she is unable to stand in one position for more than a few seconds without losing her balance and must constantly rock back and forth from foot to foot to avoid falling. [Tr. 121]. Plaintiff also states that she is unable to sit for long periods due to circulation problems in her legs, and that when she sits, she must have her legs elevated. [Tr. 121]. Plaintiff once again argues that Defendant failed to consider crucial disabling conditions in making this determination. She argues that her hereditary coagulopathy is treated with Coumadin and Heparin, which causes her to be susceptible to hemorrhaging and greatly limits her from any employment when she may suffer cuts, scrapes, or punctures. Plaintiff also argues that VRE (vancomycin-resistant enterococci), MRS (methicilin-resistant staphylococcus aureus), and proteus and pseudomonas are conditions without a known cure that do not spontaneously disappear. Plaintiff argues that these bacterial conditions pose an "insurmountable barrier" to her employment. However, Plaintiff's citations refer to the report issued by Dr. Hestand. As noted previously, Dr. Hestand, a Ph.D. and Licensed Psychologist, records the date of exam as May 11, 1996, and stated that Plaintiff's "prognosis is best determined by a physician." [Tr. 124-26]. Additionally, Plaintiff's class attendance and part-time job conflict with Plaintiff's allegation that her bacterial conditions, even if they are still present, prevent her from working.

In its denial, Hartford also discussed Plaintiff's full-time class attendance, work history and education, and the duties of Plaintiff's part-time job,[3] which include answering the telephone, data entry, and some filing. [Tr. 901]. Defendant stated that based on a review of the contents of the claim file, it has been determined that the Plaintiff has the capability to at least perform sedentary work on a full time basis. Defendant defines sedentary work as exerting up to ten pounds occasionally, sitting most of the time, and may include walking or standing for brief periods. [Tr. 901]. Defendant states that it performed an Employability Analysis, which revealed that Plaintiff was able to perform 5 different occupations: data examination clerk, sorter, appointment clerk, charge account clerk, and credit card clerk, which are prevalent in the National Economy. [Tr. 901].

Plaintiff argues that Defendant denies that Plaintiff's tuition and books were paid for by Arkansas Disability Services, although Defendant argues that this does not diminish evidence of her functional capabilities, i.e. Plaintiff has the ability to attend classes full-time. [Tr. 980]. Plaintiff argues that Defendant ignores the fact that special accommodations are made for her enabling her to alternate sitting and standing and that a platform is provided enabling her to elevate her feet. [Tr. 980]. However, Defendant argues that Plaintiff seems to imply that an employer in the workforce would not be willing or able to give her similar accommodations that would allow her to work, but that under the Americans with Disabilities Act, any employer would be required under federal law to do just that. *See* 42 U.S.C. § 12112(b)(5)(a). Plaintiff's arguments are not persuasive.

---

[3]Although Defendant asserts that Plaintiff began this work-study position on a full-time basis in August 2002, Defendant's citation does not adequately support this assertion. [Tr. 1149].

Finally, Plaintiff argues that on October 25, 1999, an administrative law judge for the Social Security Administration found that "there are no jobs existing in significant numbers which she can perform" and "the claimant has been under a disability as defined by the Social Security Act and Regulations since August 21, 1997." [Tr. 1864-65]. However, Plaintiff acknowledges that the Social Security Administration's determination is not binding, although it is admissible evidence to support an ERISA claim for long-term disability benefits. *Duffie v. Deere & Co.*, 111 F.3d 70, 74 (8th Cir. 1997). The Court also notes that this determination was made in 1999, approximately three and one-half years before the time period at issue in this case.

After a thorough review of the record in this case, the Court finds that Defendant Hartford's decision to deny Plaintiff long term disability benefits under the plan was not an abuse of discretion. While the Court does not doubt that Plaintiff was disabled through May 31, 2003, as Hartford acknowledged through an award of benefits through that period, the decision of the Defendant denying Plaintiff's claim beyond May 31, 2003, was supported by substantial evidence and the decision offered a reasoned explanation based upon the evidence.

Accordingly,

IT IS HEREBY ORDERED THAT Defendant's Motion for Judgment on the Record (Docket #31) shall be, and is hereby, GRANTED.

IT IS FURTHER ORDERED THAT Plaintiff's Motion for Judgment on the Record (Docket #33) shall be, and is hereby, DENIED.

IT IS SO ORDERED THIS 23rd day of February, 2007.

/s/Garnett Thomas Eisele_____
UNITED STATES DISTRICT JUDGE